1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   EDUARDO LARIN, on behalf of himself and all others similarly situated,, | CASE NO. 09cv1062 DMS (RBB) |
| 12                                         Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION TO** |
| 13        vs. | **DISMISS THE SECOND AMENDED COMPLAINT** |
| 14   BANK OF AMERICA, N.A., et al., | **[Docket No. 36]** |
| 15                                         Defendants. | |

16

17        On September 30, 2009, this Court granted Defendant's motion to dismiss Plaintiff's First

18   Amended Complaint because Plaintiff's claims were preempted by the Expedited Funds Availability

19   Act ("EFAA") and the National Bank Act ("NBA").  After obtaining new counsel to represent him

20   in this matter, Plaintiff filed a Second Amended Complaint that realleges the claims in the First

21   Amended Complaint.  In response to the Second Amended Complaint, Defendant filed the present

22   motion to dismiss.  Plaintiff filed an opposition to the motion, and Defendant filed a reply.  For the

23   reasons discussed below, the Court grants Defendant's motion.

24                                              **I.**

25                                        **BACKGROUND**

26        This case is a purported class action alleging violations of California's Consumer Legal

27   Remedies Act ("CLRA"), unfair competition and false advertising laws, and a breach of the implied

28   covenant of good faith and fair dealing.  The named Plaintiff, Eduardo Larin, had a checking account

1   and credit card with Defendant Bank of America.  Plaintiff was also enrolled in one of Defendant's

2   overdraft protection plans, specifically, one which linked his credit card to his checking account for

3   overdraft protection.

4         Plaintiff alleges that when he enrolled in Defendant's overdraft protection plan ("ODP"),

5   Defendant also enrolled Plaintiff in an uncollected funds protection plan ("UFP") without his

6   knowledge or consent.  (Second Am Compl. ¶ 30.)  In contrast to the basic method of processing

7   deposits, which Plaintiff alleges is based primarily on the customer's checking account balance, UFP

8   uses "linked accounts (balances, credit limits) as funding sources to secure quicker access to

9   uncollected funds when the checking account balance would otherwise trigger a hold."  (*Id.* ¶ 27.)

10         On May 16, 2006, Plaintiff deposited a check for $7,500 into his checking account at a Bank

11   of America branch in San Diego, California.  (*Id.* ¶ 47.)  Before making this deposit, Plaintiff had

12   $1,847.17 in his checking account.  (*Id.*)  After the deposit, and in accordance with the UFP feature,

13   Plaintiff's available balance appeared to be $9,347.17.  (*Id.* ¶ 48.)  Plaintiff alleges these funds would

14   not have been available immediately if he had not enrolled in ODP.  (*Id.* ¶ 49.)

15         On May 18, 2006, Plaintiff withdrew $6,420 from his checking account at a Bank of America

16   branch in San Diego, California.  (*Id.* ¶ 49.)  The next day, a check for $200 was paid out of Plaintiff's

17   checking account, leaving a balance of $2,727.17.  (*Id.*)

18         On or before May 23, 2006, the $7,500 check Plaintiff deposited into his account was returned.

19   (*Id.* ¶ 50.)  This left a negative balance of $4,772.83 in Plaintiff's checking account.  (*Id.*)  Plaintiff

20   was charged a "deposited item return fee" of $5.  (*Id.*)

21         In accordance with Plaintiff's ODP, Defendant transferred $4,800 from Plaintiff's credit card

22   to his checking account to cover the negative balance.  (*Id.* ¶ 51.)  In connection with this transaction,

23   Plaintiff was charged a "cash advance fee" of $144, and an interest rate of 23.99% on the $4,800

24   balance on his credit card.  (*Id.* ¶ 52.)

25         Plaintiff alleges Defendant's policies and practices relating to its ODP violates the CLRA and

26   California's unfair competition and false advertising laws, and that this conduct amounts to a breach

27   of the implied covenant of good faith and fair dealing.

28

**II.**

**DISCUSSION**

Defendant raises two primary arguments in its motion to dismiss.  As in its first motion to dismiss, Defendant argues Plaintiff's claims are preempted by the EFAA and the NBA.  Second, Defendant contends Plaintiff has failed to plead the necessary elements of each claim.

**A.      Standard of Review**

In two recent opinions, the Supreme Court established a more stringent standard of review for 12(b)(6) motions.  *See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  To survive a motion to dismiss under this new standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).  In *Iqbal*, the Court began this task "by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Id.* at 1951.  It then considered "the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951.

**B.      Preemption**

Defendant's first argument in support of its motion to dismiss is that Plaintiff's claims are preempted by the EFAA and the NBA.  The Court addresses each of these statutes below.

1.      EFAA

"The purpose of EFAA is to provide faster availability of deposited funds." *Beffa v. Bank of West*, 152 F.3d 1174, 1176 (9th Cir. 1998) (citation omitted).  EFAA also mandates that banks disclose their funds availability policies to their customers. *See* 12 U.S.C. § 4004.

Here, Defendant argues Plaintiff's claims are expressly preempted by EFAA, and more specifically, by Regulation CC promulgated thereunder.  Both the statute and the regulation expressly

1  provide for preemption of inconsistent state laws.  12 U.S.C. § 4007(b); 12 C.F.R. § 229.20(b).  The

2  regulation explains that a state law may be inconsistent with EFAA if it:

3      (1) Permits a depository bank to make funds deposited in an account by cash,
        electronic payment, or check available for withdrawal in a longer period of time than
4       the maximum period of time permitted under subpart B, and, in connection therewith,
        subpart A; or (2) Provides for disclosures or notices concerning funds availability
5       relating to accounts.

6  12 C.F.R. § 229.20(c).  The Ninth Circuit has found that the preemptive scope of these provisions "is

7  quite narrow.  Only state laws that establish different timing or disclosure requirements than EFAA

8  or otherwise directly conflict with EFAA face preemption.  Congress expressed no desire to preempt

9  state laws or causes of action that supplement, rather than contradict, EFAA."  *Beffa*, 152 F.3d at

10  1177.  In granting Defendant's motion to dismiss the First Amended Complaint, this Court found that

11  Plaintiff's claims were preempted by EFAA because they were based on Defendant's funds

12  availability policies and the disclosures surrounding those policies.  According to Defendant, that

13  remains the basis for the claims alleged in the Second Amended Complaint, therefore the Court should

14  again find that Plaintiff's claims are preempted.  Plaintiff, however, disputes this characterization of

15  his claims.  He states,

16      the gravamen of [his] allegations is that: 1) when BANA's customers choose to enroll
        in its optional ODP program, which Defendant represents to be added protection
17      against overdraft with respect to customer's *own* items drawn on their checking
        accounts solely, BANA surreptitiously also enrolls them in its UFP program and thus
18      enters customers into an unauthorized contractual relationship for UFP; and 2) at the
        time of enrollment, customers are thus unaware that the accounts they link to their
19      checking account for ODP of their own items are also being linked to the stealth UFP
        feature to secure BANA's extension of provisional credit for third-party checks
20      deposited into their accounts to hedge the risk of these items not clearing.

21  (Opp'n to Mot. at 13.)

22          In general terms, and as alleged in the Second Amended Complaint, the basis for Plaintiff's

23  claims appears to be Defendant's "false and misleading statements concerning [its] ODP program[.]"

24  (Second Am. Compl. ¶ 101.)  Those statements include representations that (1) Defendant's ODP is

25  ordinary when, in fact, it includes the undisclosed UFP feature, and (2) Defendant's ODP will protect

26  consumers from overdrafts and overdraft-related fees when, in reality, it creates "a greater risk of

27  overdrafts and ODP related fees and charges."  (*Id.* ¶ 36.)  Plaintiff also challenges Defendant's

28  surreptitious enrollment of its ODP customers in UFP.  None of these theories directly implicates the

- 4 -                                                    09cv1062

1 time in which Defendant makes deposited funds available to its customers or Defendant's disclosures

2 or notices concerning funds availability.  Therefore, Plaintiff's claims as alleged in the Second

3 Amended Complaint are not preempted by EFAA.

4       2.    NBA

5       As with EFAA, "[f]ederally chartered banks are subject to state laws of general application

6 in their daily business to the extent such laws do not conflict with the letter or the general purposes

7 of the NBA." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).  The purpose of the NBA,

8 however, is much greater than EFAA.  Whereas EFAA is concerned with the limited issue of funds

9 availability, the NBA governs "all such incidental powers as shall be necessary to carry on the

10 business of banking."  12 U.S.C. § 24 Seventh.

11       Included in these powers is the authority to "receive deposits and engage in any activity

12 incidental to receiving deposits, including issuing evidence of accounts, subject to such terms,

13 conditions, and limitations prescribed by the Comptroller of the Currency and any other applicable

14 Federal law."  12 C.F.R. § 7.4007(a).  National banks may exercise these "deposit-taking" powers

15 "without regard to state law limitations concerning: ... ii) Checking accounts; (iii) Disclosure

16 requirements; (iv) Funds availability[.]"  12 C.F.R. § 7.4007(b)(2)(ii)-(iv).

17       In the order granting Defendant's first motion to dismiss, this Court found Plaintiff's claims

18 were preempted by this regulation because they would affect Defendant's deposit-taking powers in

19 each area, *i.e.*, checking accounts, disclosure requirements and funds availability.  Defendant argues

20 the claims alleged in the Second Amended Complaint have the same effect, therefore the Court should

21 again find Plaintiff's claims are preempted.

22       Plaintiff disputes Defendant's argument, and relies on several cases in support. First, Plaintiff

23 cites *In re Checking Account Overdraft Litig.*, 694 F.Supp.2d 1302 (S.D. Fl. 2010).  In that

24 multidistrict litigation, the plaintiffs alleged the defendant banks had a common practice of posting

25 debits to the plaintiff's account "from the 'largest to the smallest' thus maximizing the overdraft fee

26 revenue for themselves." *Id.* at 1307.  The defendants moved to dismiss the case on several grounds,

27 including preemption by the NBA.  The court denied the motion, and specifically rejected the

28

1  defendants' preemption argument.  The court reasoned that the claims sounded in contract and tort,

2  and had only an incidental effect on the banks' exercise of their deposit taking powers.  *Id.* at 1313.

3      In reaching that decision, the court relied on two cases that Plaintiff cites in his opposition to

4  the present motion.  One of those cases is *White v. Wachovia Bank, N.A.*, 563 F.Supp.2d 1358 (N.D.

5  Ga. 2008).  That case was based on facts similar to those in the multidistrict case, and also alleged that

6  the defendant banks were imposing overdraft fees "even when there are sufficient funds in the account

7  to cover the transaction."  *Id.* at 1361.  Like the defendants in the multidistrict case, the defendant in

8  *White* filed a motion to dismiss based on several grounds, including preemption by the NBA.  The

9  *White* court rejected that argument, finding that the plaintiffs' claims sounded in tort and contract and

10  did "not more than incidentally affect Wachovia's deposit-taking powers."  *Id.* at 1367.  In reaching

11  that decision, the court noted that although the case implicated the defendant's "largest-to-smallest

12  transaction posting policy, it more importantly claims that Wachovia's policy allows the routine

13  imposition of an overdraft fee for transactions that do not result in an actual overdraft."  *Id.* at 1368.

14      The other case Plaintiff relies on is *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923

15  WHA, 2008 WL 4279550 (N.D. Cal. Sept. 11, 2008).  Like the multidistrict case and *White*, *Gutierrez*

16  involved the bank's practice of posting "multiple daily debits against a checking account in a revised

17  sequence that maximizes overdraft penalties against the customer rather than in the actual sequence

18  in which the charges were incurred, among other alleged practices."  *Id.* at *1.  The defendant bank

19  moved for summary judgment on several grounds, including preemption by the NBA, and the court

20  denied the motion.  It found that neither 12 C.F.R. § 7.4002 nor 12 C.F.R. § 7.4007 expressly

21  preempted the plaintiffs' claims.  *Id.* at *9.  The court also relied on a 2002 advisory letter from the

22  Office of the Comptroller of the Currency ("OCC") and a May 22, 2001 interpretive letter from the

23  OCC in declining to find preemption.[1]  *Id.* at *10-12.

24      At first glance, these cases appear to support a similar conclusion in this case, *i.e.*, that

25  Plaintiff's claims are not preempted.  However, the Court declines to follow that line of cases.  Both

26

27  [1]  The *Gutierrez* opinion cites a May 21, 2007 advisory letter from the OCC, but "[t]he issuance of Advisory Letters was suspended at the end of 2004." http://www.occ.treas.gov/advlst04.htm.  The letter cited in the opinion appears to be Interpretive Letter #916, which was issued on May 22, 2001.

28

- 6 -                                                    09cv1062

1   the multidistrict case and *White* are from outside the Ninth Circuit, and thus do not follow the Ninth

2   Circuit's approach to preemption analysis. In *Silvas v. E\*Trade Mortgage Corp.*, 514 F.3d 1001, 1004

3   (9th Cir. 2008), the Ninth Circuit set out a framework for analyzing preemption under the Home

4   Owners' Loan Act ("HOLA"), and that framework has since been applied to the NBA. *See Davis v.*

5   *Chase Bank U.S.A., N.A.*, 650 F.Supp.2d 1072 (C.D. Cal. 2009) (applying *Silvas* framework to issue

6   of NBA preemption). According to that framework, courts should first determine whether the state

7   laws at issue fall within subsection 12 C.F.R § 7.4007(b)(2). If they do, the laws are preempted, and

8   no further analysis is necessary. If the laws do not fall within subsection (b)(2), courts must then

9   consider whether the laws fall within subsection (c). Neither *White* nor the multidistrict case followed

10  this approach. Rather, those courts skipped the first step of the *Silvas* analysis and proceeded directly

11  to determine whether the state laws at issue sounded in contract or tort. *See In re Checking Account*

12  *Overdraft Litig.*, 694 F.Supp.2d at 1313; *White*, 563 F.Supp.2d at 1367. After concluding that the state

13  law claims did sound in tort and contract, the courts then addressed whether the claims "more than

14  'incidentally affect the exercise of national banks' deposit taking powers.'" *In re Checking Account*

15  *Overdraft Litig.*, 694 F.Supp.2d at 1313 (citing 12 C.F.R. § 7.4007(c)). *See also White*, 563 F.Supp.2d

16  at 1367 (concluding that plaintiffs' exercise of their rights "does not more than incidentally affect

17  Wachovia's deposit-taking powers.") Neither case addressed whether application of the state laws

18  at issue would impose any limitations on the defendants' deposit-taking powers or otherwise fell

19  within the confines of subsection (b)(2).

20       *Gutierrez* also failed to apply the *Silvas* approach. That court found *Silvas* was inapplicable

21  to the NBA because the regulations under that statute were "dissimilar" to the regulations under the

22  HOLA. 2008 WL 4279550, at * 12. However, as the *Davis* court pointed out,

23      The extent of Federal regulation and supervision of Federal savings associations under
    the Home Owners' Loan Act is substantially the same as for national banks under the

24      national banking laws, a fact that warrants similar conclusions about the applicability
    of state laws to the conduct of the Federally authorized activities of both types of

25      entities.

26  Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904-01, 1912 n.62

27  (Feb. 12, 2004). The *Gutierrez* court did not take this reasoning into consideration, and instead drew

28

1 | a distinction based solely on the difference between the regulations.  This Court finds the reasoning

2 | of *Davis* more persuasive, and that reasoning supports the application of *Silvas* to the facts of this case.

3 | Under *Silvas*, the first issue for the Court is whether the state laws at issue fall within

4 | subsection 7.4007(b)(2).  That subsection states "[a] national bank may exercise its deposit-taking

5 | powers without regard to state law limitations concerning: ... (ii) Checking accounts; (iii) Disclosure

6 | requirements; (iv) Funds availability[.]" 12 C.F.R. § 7.4007(b)(2)(ii)-(iv).  Plaintiff attempts to avoid

7 | this subsection by asserting that his claims focus on Defendant's surreptitious enrollment of its ODP

8 | customers into the UFP program, not Defendant's deposit taking powers.  However, this assertion

9 | ignores the underlying facts giving rise to Plaintiff's claims, and the nature of the alleged UFP

10 | program.

11 | Although Plaintiff casts his claims as a challenge to Defendant's representations and

12 | enrollment practices concerning ODP, Plaintiff's enrollment in that program did not give rise to the

13 | claims alleged in this case.  Rather, the event that triggered Plaintiff's claims was Plaintiff's *deposit*

14 | of "a $7,500 check into his *checking account* at a BANA branch in San Diego, California[,]" (Second

15 | Am. Compl. ¶ 47) (emphasis added), and Defendant's process of making those *funds available* to

16 | Plaintiff.  Clearly, that transaction involved Defendant's deposit taking powers, and more specifically,

17 | its deposit taking powers concerning checking accounts and funds availability, as set out in

18 | subsections 7.4007(b)(2)(ii) and (iv).

19 | These critical facts, *i.e.*, Plaintiff's deposit of a third party check and Defendant's processing

20 | thereof, are notably absent from the cases in which courts have declined to find preemption.  *White*

21 | was limited to allegations that "Wachovia delays, reorders, or otherwise manipulates posting

22 | transactions to an account and imposes overdraft fees even where the account contains sufficient funds

23 | to pay a draft."  563 F.Supp.2d at 1361.  Indeed, the court appeared to rely more on the latter

24 | allegation in finding no preemption under subsection 7.4007.  *Id.* at 1367.  The claims in *Gutierrez*

25 | also did not involve any deposit-taking powers of the defendant bank.  Rather, those claims were

26 | based on the bank's "practice of resequencing multiple daily posting of debits *from largest to smallest*

27 | so as to use up the account as fast as possible and thus impose as many overdraft fees as possible[,]"

28 | 2008 WL 4279550, at *3, as well as the bank's "practice of including items and then deleting them

1  without adequate notice, thereby deceiving customers into thinking they have a larger balance and

2  inducing them to go into overdraft situations[.]" *Id.* at *9. *In re Checking Account Overdraft Litig.*,

3  like *White*, was also limited to the bank's procedures for posting debits and "the allegedly unlawful

4  manner in which the banks operate their overdraft programs to maximize fees at the expense of

5  consumers."  694 F.Supp.2d at 1313.

6       Plaintiff here attempts to cloak his claims in the protective shield of these cases by focusing

7  on Defendant's ODP, but as stated above, Plaintiff's claims do not arise from his enrollment in that

8  program.  Rather, his claims derive from the alleged UFP feature of Defendant's ODP program, and

9  as Plaintiff describes it, UFP is a method of "deposit processing[.]" (Second Am. Compl. ¶ 27.)  As

10  so alleged, Plaintiff's claims are preempted by the NBA.[2]

11  **III.**

12  **CONCLUSION**

13       For these reasons, the Court grants Defendant's motion to dismiss Plaintiff's Second Amended

14  Complaint.  The Second Amended Complaint is hereby dismissed with prejudice.

15      **IT IS SO ORDERED**.

16  DATED:  July 22, 2010

17  _____

18  HON. DANA M. SABRAW
    United States District Judge

19

20

21

22

23

24

25

26

27

28      [2] In light of this finding, the Court declines to address Defendant's other arguments in support of dismissal.